NATIONAL BANK OF GREECE *et al. v.* SAVARIKA *et al.*

(Division B.   June 5, 1933.   Suggestion of Error Overruled, July 7, 1933.)

[148 So. 649.   No. 30652.]

W. C. Wells, III, J. Morgan Stevens, Wells, Jones, Wells & Lipscomb and J. M. Stevens, Jr., all of Jackson, for appellants.

574

**Howie & Howie**, of Jackson, for appellees.

**Anderson, J.**, delivered the opinion of the court.

A part of the estate left by Constantine Menelas at the time of his death in July, 1916, in Lincoln county, is here involved. Menelas died testate. In his will he bequeathed a certain part of his estate "To National Bank of Greece at Athens, Greece, to be kept by said bank as a permanent endowment for the benefit of a school for girls at Bougasticon, Macedonia, Greece, the interest only to be paid over to the trustees of such school." His heirs claimed that conditions had arisen that prevented the carrying out of this bequest, and therefore

it had lapsed and belonged to them. The chancellor so held. From that decree appellants prosecute this appeal.

We are of opinion that the chancellor reached the right conclusion, based on sound reasons and supported by ample authority. The chancellor embodied his decision and his reasons therefor in a written opinion made a part of the record in the case. We do not think we could do better than to adopt his opinion as the opinion of the court, which immediately follows:

"The clause of the will in controversy provides that: 'After all my debts have been paid, and all legitimate expenditures made, including all costs and expenses incident to winding up my estate, it is my further will and desire that the money remaining in the hands of my Executors be transmitted by my Executors to Ralli Bros. of New York City, with directions to forward six thousand dollars, or twelve hundred pounds sterling, to my nephew, Panteli Mikas, at Athens, Greece, and the balance to forward, after deducting exchange and expenses, to National Bank of Greece, at Athens, Greece, to be kept by said bank as a permanent endowment for the benefit of a school for girls at Bougasticon, Macedonia, Greece, the interest only to be paid over to the trustees of such school. However twenty pounds of such interest per annum is to be paid to the widow of my deceased brother, Christus Mikas, each year during the balance of her life if she shall survive me. The said Ralli Brothers are to forward a duly certified copy of this will to said National Bank of Greece, in order that it may be informed as to the trust imposed, to the end that the endowment herein made may be effectually carried out. The receipt of the said Ralli Brothers to my executors for the net amount in money of my estate shall discharge them from any further obligations as executors.'

"Reduced to its substance, the expression is that the fund be forwarded to the Ralli Brothers, to be by them

forwarded to the National Bank of Greece, to be by it kept as an endowment for the 'Benefit of a school for girls at Bougasticon, Macedonia, Greece, the interest only to be paid over to the trustees of such school.'

"It appears that the Ralli Brothers declined to transmit the fund, and that it is incumbent upon this court, if the fund is to be transmitted at all, to transmit it through some other agency.

"The will—pertaining in this particular to personal property—is to be tested by the lex domicilii, or the law of the testator's domicile, and as though the beneficiaries were resident here.

"Bougasticon, Macedonia, at the time of the execution of the will, was Turkish territory, and under the government of that empire. This may have influenced the deceased in his desire to contribute to the education of the female foreign children of his countrymen, who would otherwise perhaps have been without the advantages incident to the educational purpose and policy of the Greeks, and probably, to a large extent, with but little educational advantages at all. We may surmise that this was the occasion of his sentiment with reference to the residuum of his estate, but, in so surmising, we derive the material for the idea, not from any express or implied meaning of the will, but solely from the probabilities of human motives, and human conduct, influenced by the associations, traditions, racial interests, relations, and religion of one's own people.

"Subsequently, and for some years now, the Bougasticon territory has been restored to Greece, and the general system of national education prevailing in the republic applies to the children of Bougasticon, and other Greek children alike. And, if there ever was a school for girls in this locality, maintained in whole or in part by the deceased, during the rule of the Turks (and that appears to have been the case), it no longer exists. And in order that one, distinct and separate from other

schools, might be provided to give some semblance of effect to the will, it must be orignated, organized, established, endowed, and operated, by this or some other court, or by the banking institution mentioned in the instrument. And thus we are led directly to the difficulties encountered in an attempted interpretation of the will, from the standpoint of the express or implied intent of its author, and the application of the subject-matter according to some disclosed plan of his, and not of ours. These are the difficulties which have made it impossible through the years to make any definite and satisfactory disposition of the fund, and, except for an arbitrary and cy-pres selection of objects, to make any disposition at all.

"The money is to be forwarded to a bank to be kept as an endowment, from which the interest is to be paid over to the 'trustee of such school.' The bank thus becomes a mere depository for the funds, and an agency for the distribution of the accruing interest. And is to pay such interest over to the trustees of such school.

"What trustees? What school?

"No trustees are named, and no mode is prescribed for their selection.

"How many trustees, and from what locality?

"No power to select them is delegated to the bank. Nor to prescribe their duties, determine their qualifications, fix their compensation, and limit their tenure of service. When the interest is to be paid, and for what purpose, and the time in which the scheme is to take effect, are all omitted. The courts of this state will not permit a trust to fail merely for want of a trustee, but such courts have no power to create a trust, select the beneficiaries, appoint trustees, and prescribe the plans and details of administration. It is not within their province to make or complete a will for the testator.

"The object (and the only expressed object) being 'A school for girls,' we are left to conjecture as to the

particular kind, or type, or purpose, of the school intended. Whether for general education, or for some special branch of knowledge, is not disclosed. Whether a business school, a cooking school, a school of art, music, dancing, domestic science, sewing, or the like, is not stated. Whether the school is to be kindergarten, or other school—whether for religion, science, economics, politics, or philosophy—are all alike, uncertain. And either of these, so far as the words of the will are concerned, would meet the requirements. Must this court make the selection? It must, if it be made, since, under the laws of this state (if the will be invalid), this court cannot transmit the instrument to some other court to make it. The will is subject to construction, and must stand or fall, by the lex domicilii, and only if valid can the subject-matter be transmitted for administration to a foreign jurisdiction.

" 'A school for girls.'

"What girls?

" 'A school for girls at Bougasticon.'

"If the school is to be at Bougasticon 'for girls at Bougasticon,' we may wonder whether such girls are to be native or foreign girls—whether Greeks, or members of any nationality within the designated locality. It seems from the will that, if the girls are 'at Bougasticon,' they will answer the description, whencesoever they may come, or whensoever they may go. I am speaking, of course, of what the will says, and not of what it should or might have said. The will says 'For girls at Bougasticon,' and we do not know whether they must have been born there, or whether they must reside there, or whether they may be just there to attend school. Nor can we tell whether (if born, or residing there) all such girls, without regard to nationality, would be eligible. Nor at what age, or in what class, or creed, or condition, would they be admitted. Who is to

determine these matters? Will the bank do it, or the trustees, and, if so, whence do they obtain their authority? The latter do not exist, and no power of selection or appointment is vested in any person or institution. There is no room for the operation of the rule pertaining to ambiguities, since identity is lost in universality, and description is more complete in generality than in detail. Wills must be construed, and the intention of the testator found, not in what he intended to say, but in what he did say. In his expression, and not in his silence, we seek his meaning, and, when we exceed this rule, we make the will, and direct the way the bounty should be applied. But, even if from the meager evidence in the record there does appear some vestige of an institution of which the deceased was a patron when the Turks ruled his native province, that institution no longer exists, and the legacy has lapsed for want of an object in esse to which the fund could be appropriated. Lovelace v. Marion Institute et al., 215 Ala. 271, 110 So. 381; City of New Orleans v. Hardie (German Protestant Home for the Aged and Infirm v. Hardie), 43 La. Ann. 251, 9 So. 12; In re Pearsons' Estate, 113 Cal. 577, 45 Pac. 849, 1062; Bond v. Home for Aged Women of Cedar Rapids et al., 94 Iowa, 458, 62 N. W. 838; Thompson Wills, p. 717, and note.

"From the foregoing it will be seen that any agency which might undertake to dispose of the residuum of the estate in trust for charity would have to select, organize, and establish some plan, both as to subject and object, and that little or no aid could be had for particularity or definiteness from the language of the instrument, by which alone the administration must be governed. Not alone the means, but the end, must be attained through independent and original opinion. Some power other than that vested in the courts of this commonwealth would have to be exerted in the application, expenditure, and accounting for the fund. For at no

time, even in the judiciary history of England, could the court of chancery, by virtue of its inherent equity powers, and in accordance with the principles of the common law, have completed the details, prescribed the terms, and accomplished the administration of a trust in this case. Bascom et al. v. Albertson et al., 34 N. Y. 584; Trustees of Philadelphia Baptist Association v. Hart's Executors, 4 Wheat. 1, 4 L. Ed. 499; Fontain, Administrator, v. Ravenel, 17 How. 369, 15 L. Ed. 80; Levy et al. v. Levy et al., 33 N. Y. 97; Tilden v. Green et al., 130 N. Y. 29, 28 N. E. 880, 14 L. R. A. 33, 27 Am. St. Rep. 487. Prior to the celebrated Mortmain Acts of 9 Geo. II, and subsequent restrictions by parliament upon judicial abuses in matters of indefinite charitable uses, such courts would have seized upon the fund and disposed of it under the authority of the cy-pres doctrine, the Statute of 43rd Elizabeth, or the sign manual of the British crown. But, manifestly, none of these practices have any sanction in our jurisprudence, and courts of chancery here must administer wills of deceased persons in response to the expressed intentions of the testators, or not at all. Boarman v. A. A. Catlett et al., 13 Smedes & M. 149. The power of such courts is judicial and administrative, and not legislative or creative. Whether the trust or use attempted to be raised is a charity is not the dominant question, but whether there is a trust at all, or one that could be enforced, is the question. That charitable uses were known to the ancient English courts, and that indefiniteness in the beneficiaries is an essential element of a charity, and that charity begins where definiteness ends, and that definiteness in cestuis que trustent converts a charitable use into a private trust, are propositions generally familiar to the profession, but that there must be a limit to indefiniteness is also a proposition fundamental to the principles of judicial limitation, and to the institutions of a free and self-governed people. In an early and

perhaps the first case of the kind in this country (Philadelphia Baptist Ass'n v. Hart, 4 Wheat. 1, 4 L. Ed. 499), the court, through Chief Justice MARSHALL, held that, while it was never seriously questioned that courts of equity by reason of their jurisdiction over trusts in general had jurisdiction over charitable trusts, 'when they presented no unusual features,' the power of such courts to effectuate charitable donations in favor of uncertain beneficiaries, or those in whom no legal estate vested, originated in the Statute of 43rd Elizabeth, and had no existence at common-law prior thereto. The position was not universally accepted, and the question again came before the court in Vidal v. Girard's Executors in 1844, 2 How. 127, 11 L. Ed. 205. After an elaborate examination of authorities, and thirty or more ancient cases dug up by the commissioners on the public records of England, it was held that the statute of Elizabeth did not enlarge the jurisdiction of chancery, but that charities had previously been sustained, though upon doubtful and indistinct, sources of judicial authority. This, with varying qualifications, as to the degree of indefiniteness in the beneficiaries, may be accepted as the general rule, except such diversity as has arisen from the error of attributing the origin of charities, with their cy-pres feature to the common rather than to the civil law, and to the secular rather than to the secretarian chancellors of the ancient bench of England. Without regard to the refinement of distinction between the use of the term of "cy-pres" to describe the power exercised by the English chancellors in charity cases under the sign manual of the crown, on the one hand, and that exercised under the assumed general jurisdiction of equity, on the other, the practice in either case is incompatible with the public and judicial policy of this state, and repugnant to its law of wills, and of inheritance, under the statutes of descent and distribution, and the judicial decisions of the highest court on the subject.

As considered here, the doctrine is that referred to by text-writers as 'where an apparent charitable intention has failed, whether by an incomplete disposition at the outset, or by subsequent inadequacy of the original object, effect would be given to it by a cy-pres or proximate application, notwithstanding that in ordinary cases the trust would be void for uncertainty, and would result to the donor or to his representatives.' Adams, Equity, section 69—Pomeroy, GRAY, J., in Jackson v. Phillips et al., 14 Allen (Mass.) 539. The whole subject of charities, with its peculiar cy-pres feature, has been one of spirited controversy, and the arguments of Mr. Webster, Mr. Binney, and Mr. Sargent, in the celebrated Girard Will Case, 2 How. 127, 11 L. Ed. 205, were directed primarily to whether, and to what extent, indefinite trusts could consistently be administered in this country after the revolution with the regular and generally recognized principles of the common law. The question involved an identification of the common law on the subject, and an examination of ancient precedents to ascertain whether in reality such trusts were enforced under that or under some other system, and whether in turn the latter was independent of, engrafted upon, or confused with, the common law. Whencesoever charities came, they brought the cy-pres incident with them, or developed it as a convenient adjunct, or corollary, to the judicial process of construction and administration of such trust.

''What is meant here by the common law (as applicable to this jurisdiction) is that portion of the law of England which is based not upon legislative enactment, but upon immemorial usage, and the general consent of the people. It is the unwritten law, as defined by Mr. Blackstone in his work. It does not include the cy-pres practice of the English judges in matters of charities, whether exercised upon the theory of a presumed inherent power in the court to that end, in a given class of cases, or under the sign manual for the

king, in another class of cases (Bascom et al. v. Albertson et al., 34 N. Y. 584; Levy et al. v. Levy et al., 33 N. Y. 97). Being an apparent innovation from the civil law, or from the Statute of 43rd Elizabeth, chapter 4, charities, such as those which require a resort to the aid of cy pres for their execution, having no standing, it cannot be administered consistently with the jurisprudence of this state. For the same reason the majority of the American courts (and notably the Supreme Court of New York), rejected 'Charities' which were so indefinite as to require judicial intervention cy pres for their administration, and not until 1893, after the defeat of the Will of Samuel J. Tilden (130 N. Y. 29, 28 N. E. 880, 14 L. R. A. 33, 27 Am. St. Rep. 487) for a public library in New York City, was the rule relaxed, and then by an act of the state legislature intended expressly for that purpose. Other states have enacted laws of similar import, but, if this state has any legislation on the subject, other than the statutes of mortmain, my attention has not been directed to it. Sovereignty acts judicially, and not creatively, in the construction and administration of wills. Constitutions and legislatures may extend or enlarge their authority, as some have done, but before a charity, such as the one asserted here, could be administered, the judge would have to be empowered to create or invent one, and then, accordingly, to administer it. Some courts, assuming that this power was derived from the common law, have undertaken to set up and administer charities from the dead, but whether any have gone to the extent of setting up lex domicilii, a charity for administration in a foreign jurisdiction, such as would have to be set up and administered in this case, I am not advised, and do not believe that any such thing has ever been attempted.

" 'Charities' (meaning indefiniteness of beneficiaries) are accepted, administered, and ever favored, whencesoever they may have originated, but 'Charities' (mean-

ing indefiniteness in every thing but the gift) are not accepted as a part of the common law of enforceable trusts, for the simple reason that, by the limitations of the common law in such particulars, no trust in such form could be identified as a trust to be enforced. Very little light can be thrown upon the question whether the 'Law of Charities' was engrafted upon the common-law antecedent to the statute of Elizabeth by a reference to the reported jurisprudence of the Middle Ages, but in a legal sense there were no charitable uses prior to that act. In a case in the year books (15 Henry VII, 12a) it is distinctly laid down that a will creating a trust for pious uses could not be enforced because 'no one hath damage by breach of the trust.' If there is a singl postulate of the common law, established by an unbroken line of decisions, it is that a trust without a certain beneficiary who can claim its enforcement is void, whether good or bad, wise or unwise. We have no statutes defining charities in this state, and we must derive our rule pertaining to them from the unwritten law of England prior to the statute of Elizabeth, or from that statute itself, in which the rule had its distinctive sanction, if not its origin. Collison's Case, Hob. 136a; Blackstone, 374; Attorney General v. Bowyer, 3 Vesey, 714; Trustees of Philadelphia Baptist Association v. Hart's Executors, 4 Wheat. 1, 4 L. Ed. 499; Yates v. Yates, 9 Bar . (N. Y.) 324; Owens v. Missionary Society of the M E. Church, 4 Kern. 380; Story Eq., sections 1142-1144; Perry on Trusts; Jarman on Wills; Fontain, Administrator, v. Ravenel, 17 How. 369, 15 L. Ed. 80; Clarke v. Sawyer, 3 Sandf. Ch. (N. Y.) 351; Lewis on Trusts, 105; Basket v. Pierce, 1 Vernon 226; Cruwys v. Colman, 9 Vesey, 319; Morice v. The Bishop of Durham, 9 Vesey, 399; Ellis v. Selby, 7 Simon, 352; Ommanney v. Butcher, 1 Turner & Russel, 260.

"For the purpose of this opinion it is not important whether 'Charities' originated in the act of Elizabeth,

or in the civil and ecclesiastical law, since it may now be conceded that 'Charities' are generally favored, and will be enforced, if there is some pivotal point of definiteness, by which, or through which, they may be administered. The principal point here is that, however or whenever they may be supposed to have been engrafted upon the common law, it is certain that neither the cypres method of construction, nor the Elizabethan method of administration, were ever considered compatible with the natural, and with the original principles and developments of the English common law. Such practices, pernicious in their nature, and dangerous in their tendency, called for the interference of Parliament, until all uses charitable within the British statutes, including that of Elizabeth, were cut off, if charged in any way upon lands, except by deed twelve months before the death of the donor. 9 Geo. II, 36. And the statute of Elizabeth was itself repealed in 1888 by the Mortmain and Charitable Uses Act of 51 and 52 Victoria, ch. 42, section 13. The cy-pres power, therefore, with its possibilities for intrigue and injustice, was not only naturally repelled by the constitutional spirit and limitations of popular government, but was justly feared by the opinion of patriotic British statesmen who sought relief from the evils of superstitious uses, in those days of power in the English sovereign and abuse in the English bench. Chief Justice WILMOT, as late as 1767, said that the court thought that 'one kind of charity would embalm the testator's memory as well as another.' Jarman on Wills, 243, and note. No wonder that Lord Bacon, before the society of Gray's Inn, complained 'that the inheritances of this realm are tossed at this day like a ship upon the sea in such sort that it is hard to say which bark will sink, and which will get to the haven. . . . The tides and currents of received errors, and unwarranted and abusive experience, have been so strong, as they were not able to keep a right course according to law.'

And no wonder that Mr. Justice McLEAN, speaking for the Supreme Court of the United States in Fontain v. Ravenel, 17 How. 369, 15 L. Ed. 80, said: 'Conceding that the bequest might be executed in England, thus furnished with the judicial and prerogative powers, the intent of the testator, however vaguely expressed, if it be construed into a charity, effect is generally given to it. This is not always done in the spirit of the donor, for sectarian prejudices, or the arbitrary will of the King's instruments, sometimes pay little or no regard to the expressed will of the testator.' The same jurist in the same case observed that: 'Some late decisions in England, involving charities, evince a disposition rather to restrict than to enlarge the powers exercised on this subject. An arbitrary rule in regard to property, whether by a king or a chancellor, or both, leads to uncertainty and injustice.' See, also, 21 Eng. Law and Eq. 308. To the same effect Chief Justice MARSHALL (Philadelphia Baptist Ass'n v. Hart, 4 Wheat 1, 4 L. Ed. 499) complained that: ''We find this prerogative employed in enforcing donations to charitable uses, which would not be valid if made to other uses, in applying them to different objects than those designated by the donor, and in supplying all defects in the instrument by which the donation is conveyed, or in that by which it is administered.' See, also, Cary v. Abbot, 7 Ves. Jr. 490; Attorney General v. Baxter, 1 Vern. 248; Manning & Manning, Freeman Ch. Cas. 330, and other similar instances. A bequest under this system, for illustration, by a Jew for establishing a Jeshua, or assembly for reading the Jewish laws, was applied under the sign manual for the support of a Christian preacher and chapel at a foundling hospital—a result which could not be more than a pretense of carrying out the testator's intentions. Da Costa v. De Pas, Ambler 228; Hooper v. Goodwin, 2 Swanst. 485, and note. In the case at bar, and had the Macedonia territory not been exchanged with the

Greeks, a Moslem school for the instruction of Turkish girls in the principles of the Koran could have been supported by the vague terms of the will cy pres, and yet no one could for a moment pretend that that was what the testator meant.

"At this point it should be observed that the cy pres practice is not to be confused with the equitable doctrine of approximation which has grown up in the judicial administration (as distinguished from judicial creation) of charitable trusts. The ecclesiastical rule of cy pres is one thing, and the equitable rule of approximation is distinctly another. Their purpose, and their application are entirely different. As said by the Alabama court (Lovelace v. Marion Institute et al., 215 Ala. 271, 110 So. 381), 'The appeal in this case is not to any cy pres power of the court, but to the equitable doctrine of approximation, in virtue of which the court of chancery exercises juris- diction merely to vary the details of administration, in order to preserve the trust, and carry out the general purpose of the donor.'

" 'It is a natural and necessary branch of the jurisdiction over charitable trusts that the means or details prescribed for their administration should be subjec to be molded so as to meet any exigency which may be disclosed by a change of circumstances, and to relieve the trust from a condition which imperils or endangers the charity itself or the funds provided for its endowment and maintenance.' 11 C. J., 358.

"But the jurisdiction of courts of equity to supervise the execution of charitable trusts does not include the power to alter the terms of the trust. Morris v. Boyd, 110 Ark. 468, 162 S. W. 69, Ann. Cas. 1916A, 1004.

"For the purpose of this opinion, we need not be concerned further with the history of charitable uses, and the cy pres doctrine, nor of their source, whether in the statute of Elizabeth or in the civil or ecclesiastical law. If they became a part of the common law, they

were engrafted upon it, and in either case the trust here cannot be enforced. Legally speaking, there is no trust. One would have to be created, and the creature (subject to ceaseless alteration) could only be correspondingly applied. It would have to be applied through the vague, voluntary, and arbitrary mode of cy pres, or the act of Elizabeth, and this court has no power to so apply it. No British statute has any validity here (Boarman v. Catlett et al., 13 Smedes & M. 149) and the cy pres power is no part of the judicial system of our government.

"That indefiniteness of beneficiaries is an essential element of a charity is not to be questioned, and this indefiniteness may include name and number, and yet there must be something definite in such indefiniteness. The latter cannot apply to an unlimited and indiscriminate portion of the human race, without at least some vested or delegated authority for selection. There must be some class, or creed, or color, or condition of mankind. There must be some criteria by which, of the object, we can say 'This is so.' 'A school for girls at Bougasticon' applies to the female children of any and all races who may ever happen to be in that locality. And who is to select them? And who is to select the school? And who is to select those who in turn are to select those who are selected? Even where there is a definite class of indefinite members, the power to select such members must be vested somewhere. If the class be indefinite, and the power of selection be wanting, the plan, or scheme, or purpose must be so definite as to admit of no conjecture by those appointed to carry it into execution. Or finally, and at least, there must be some trustee or executor to whom the fund is given for the charity, with discretion, to complete the general scheme, and with authority to put it into execution. The will in this case has no guide whatever. In respect to the projected charity the testator had no definite scheme.

He appointed no trustees, vested no title, designated no beneficiaries, and outlined no purpose. He gave no directions as to the plan or place of the institution, or the manner in which the fund was to be appropriated. He indicated no mode of selecting those who might be benefited, and he neither permitted nor prohibited gratuitous instruction. He designated no quality or course of training, and prescribed no time or condition when, and upon which, the subject of his gift should operate. He d.d nothing but leave a fund, offer a suggestion, and designate a depository. If a scheme could be devised to carry out his suggestion, it might dispose of his money, but the disposition would not be his. He seems to have acted under the impression that nothing was essential to the creation of a benevolent use but a fund, an agent, and a preference for female education. Or that, if anything more were needed, it could be supplied by others under an implied authority in the nature of a posthumous power of attorney. It is not conceivable that this can be accepted as an enforceable bequest for a charity under the laws of this state, which limit the judicial function to interpretation, and to administration accordingly. No sanction for it can be found in the statutes, or in the organic law, or in the judicial expression of any of the reported cases. They all lie in the road between us and such a judgment, and in no direction can we purposely travel towards a recognized goal. And, moreover, in order to circumvent the operation of the statutes of descent and distribution, we must completely overlook or disregard the common-law rule against perpetuities. Not that charities are ordinarily within the rule, for they are not, but when the title to the fund, legal or equitable, is vested in no human being or corporate body, and the disposition is such as to raise an executory devise through remote and voluntary agency, without reference to time for its beginning, it becomes a serious question as to whether such arrangement is within the rule

or not. Bascom et al. v. Albertson et al., 34 N. Y. 584; Ould et al. v. Washington Hospital for Foundlings, 95 U. S. 303, 24 L. Ed. 450; Jocelyn v. Nott, 44 Conn. 55; DeWolf v. Lawson, 61 Wis. 469, 21 N. W. 615, 50 Am. Rep. 148; Booth v. Baptist Church, 126 N. Y. 215, 28 N. E. 238; Hardwick v. Thurston, Jac. 381; Ex parte Evelyn, L. R., 7 Ch. 232; Pewterers v. Governors of Christ's Hospital, 1 Vern. 161; First Universalist Society v. Boland, 155 Mass. 171, 29 N. E. 524, 15 L. R. A. 231; Church v. Grant et al., 3 Gray (Mass.) 142, 63 Am. Dec. 725; In re John's Will, 30 Or. 494, 47 Pac. 341, 50 Pac. 226, 36 L. R. A. 242; Smith v. Townsend, 32 Pa. 434; Leonard v. Burr, 18 N. Y. 96.

"When is the depository to 'pay over' to trustees, and when are these latter to decide upon, select, establish, or contribute to a school? When are they to determine who are to be admitted? And from what authority will such trustees come into being? It is certainly not at any period of time within a life or lives in being, and twenty-one years thereafter. And when, and in whom, is the title to vest (there being no gift) with the authority in trust for its disposition? Any court which should seek to compel this depository to act could be met with the frank reply, 'Act upon what?' And then the only escape for such tribunal would be cy pres, through some commission, under the Statute of the 43rd Elizabeth, or through some prerogative procedure, in the nature of that of the ancient sign manual of the crown.

"So much of the fund as was to be realized from the sale of lands could not be applied on account of the mortmain provision in the constitution of this state. [Const. 1890, sections 269, 270.] · That provision and the statutes (Code 1930, sections 3564, 3565) are a limitation upon testamentary disposition, and are designed in extenso to prevent 'One who would not be generous at his own expense from being generous at the expense of his heirs.' Blackbourn v. Tucker et al., 72 Miss. 735, 17 So.

737; Hailey v. McLaurin's Estate, 112 Miss. 705, 73 So. 727; Maas v. Sisters of Mercy of Vicksburg et al., 135 Miss. 505, 99 So. 468; Greely v. Houston, 148 Miss. 799, 114 So. 740.

" 'The power which the chancellor in England exercises over donations to charitable trusts, so far as it differs from the power he exercises in other cases of trust, does not belong to the court of chancery as a court of equity, nor is it a part of its judicial power and jurisdiction. It is a branch of the prerogative power of the King as parens patriae, which he exercises by and through the chancellor, as his minister. Fontain v. Ravenel et al., 17 How, 369, 15 L. Ed. 80; 3 Blackstone's Com., pp. 47-437; Cooper, Chapter Jurisdiction Chancery Court; MARSHALL, C. J., in Baptist Association v. Hart's Executors, 4 Wheat. 1, 4 L. Ed. 499.

"It should be observed that the English chancery in later years has departed considerably from the cy-pres doctrine, repeatedly declaring that the practice had been pushed to an extravagant length, and should be restrained. Morice v. The Bishop of Durham, 9 Ves. Jr. 399; Attorney-General v. Minshull, 4 Ves. Jr. 11.

"The prerogative power here is, and has always been, in the people, and the judges, as their ministers, are limited in their functions to judicial interpretation and administration of the wills of the dead. The will of Meneias, therefore (requiring as it does the application of the cy-pres rule of judicial intervention for the establishment of some kind of educational charity to meet his vague suggestions), must in that respect be held invalid, and the complaining heirs decreed to be entitled to the property."

We do not think appellant's contention that the decree of the court of October 28, 1924, is res adjudicata of the questions involved is of sufficient seriousness to call for a discussion except to say this: (1) The record fails to show that the necessary steps were taken to ac-

quire jurisdiction of the parties. (2) In the decree the court did not undertake to pass on the validity of the claims of either appellant or appellees. (3) If the will failed so far as a girls' school is concerned, the court was powerless to render a decree barring the heirs fro n inheriting from their ancestor.

Affirmed.