*89 So.2d 281*

**In re SUCCESSION of Alexander MILNE.**

**No. 42640.**

June 11, 1956.

Rehearing Denied June 29, 1956.

Charles F. Fletchinger, Frank McLoughlin, Wood Brown, New Orleans, for petitioner and appellant.

Henican, James & Cleveland, Philip E. James, Murray F. Cleveland, Joseph McCloskey, George Denegre, Alvin R. Christovich, Jr., Denechaud & Denechaud, Charles I. Denechaud, Jr., and Leon F. Cambon, New Orleans, for intervenors-appellants.

Henry B. Curtis, City Atty., Alvin J. Liska, Asst. City Atty., New Orleans, Amici Curiae.

A. Jack Donaldson, Chaffe, McCall, Phillips, Burke & Hopkins (by Edmund McIlhenny), Frank D. Tournier, New Orleans, for intervenors and appellees.

Fred S. LeBlanc, Atty. Gen., Bertrand I. Cahn, Asst. Atty. Gen., for defendant and appellee.

Ashton Phelps, Paul O. Pigman, A. Brown Moore, New Orleans, for intervenor-appellant.

VIOSCA, Justice ad hoc.

Alexander Milne, a Scotch immigrant to New Orleans, who later became a great philanthropist and a benefactor of the poor, died in 1838. He left a will, drawn when he was ninety-four years of age, which was dated October 17, 1836 and probated October 23, 1838. It contained a series of particular legacies and the following donations, which are the subject matter of this controversy:

"It is my positive will and intention, that an Asylum for Destitute Orphan Boys, and another Asylum for the relief of Destitute Orphan Girls, shall be established at Milneburg, in this Parish, under names of the Milne Asylums, and that my Executors shall cause the same to be incorporated by the proper Authorities of this State and to the said two contemplated Institutions, and to the present Institution of the Society for the Relief of Destitute Orphan Boys in the City of Lafayette and the Parish of Jefferson in this State, and to the Poydras Female Asylum in this City, I give and bequeath in equal shares or interests of one fourth to each, all my lands on the Bayou St. John and on the Lake Pontchartrain, including the old lands of Milneburg.

"I institute for my universal heirs and legatees in equal shares or portions, the said four Institutions, that is to say, the two intended at Milneburg ,

and the two Asylums aforenamed in this City and in the City of Lafayette to whom I give and bequeath the residue of all the property and Estate moveable and immovable I may possess at the time of my decease to be equally divided and apportioned among them."

The validity of these dispositions was upheld by this Court in Milne's Heirs v. Milne's Executors, 1841, 17 La. 46. See, also, Milne Asylum v. Female Orphan Society, 1852, 7 La.Ann. 19.

The four legatees above mentioned eventually received their donations, and by Act of Partition they specifically released one another from any claim quoad "the lands and properties" received by each. We are now concerned with the proceeds of the sale of some of the lands located on Bayou St. John and on Lake Pontchartrain, which the Milne Asylum for Destitute Orphan Boys received in the Act of Partition.

By Act 4 of 1839, Milne Asylum for Destitute Orphan Boys was incorporated as a charitable corporation for the care of destitute orphan boys. A small asylum for these boys was built, and it remained in existence until the Civil War. By Act 165 of 1858 of the Legislature of Louisiana, the Board of Drainage Commissioners was empowered to levy a tax. By 1893, because of seizure and sale of its lands for non-payment of drainage taxes, Milne

Asylum for Destitute Orphan Boys, Inc. had become divested of all of its properties, except that portion bounded on the east by Franklin Avenue, on the west by Elysian Fields Avenue, on the north by Lake Pontchartrain, and on the south by Gentilly Road, City of New Orleans. A receiver was appointed for the corporation on February 2, 1900, and between that time and June 3, 1903 the corporation was recreated under the terms of the original Legislative Charter, a new Board of Directors was appointed by the Governor, and the remaining properties were turned over to the new Board.

The Trustees administered the lands until 1934, at which time they became aware of the need for a home for delinquent and destitute boys in the City of New Orleans. A contract by notarial act was entered into with the City, pursuant to Ordinance adopted by the Commission Council, whereby the Trustees leased to the City six squares of its ground rent free for ninety-nine years, conditioned upon the City's building a Milne Municipal Boys' Home. The Trustees donated $80,000 for the home, and the City agreed to contribute $100,000. The building was completed, and it is presently operated as a home for delinquent boys and needy boys. The obligation of the City was incoporated in the City's Home Rule Charter of 1954, whereby the City obligated itself to supervise and operate the Milne Municipal Boys'

Home at its own expense in recognition of the City's contract with the Trustees. The lease granted to the lessor the right to secure admission to the Milne Municipal Boys' Home, without cost or expense, of such number of destitute orphan boys needing institutional care of the kind afforded by the Home as the lessor might deem expedient and necessary.

By reason of the reclamation of the area, natural growth, and population shifts, the remaining lands took on value for residential and commercial sites. From the sales of the Milne lands the Trustees realized approximately $1,000,000, which is represented by bonds and cash. In 1955, after a lengthy study, the Trustees decided that it was presently impossible and impractical to carry out the original intent of the testator to establish and maintain an orphan asylum for boys at Milneburg. After securing the passage of Act 592 of 1954, LSA–Revised Statutes 9:2331 et seq., the Trustees proceeded in the district court under its terms and recommended the expenditure of the funds of the trust on the following projects:

1. To the Young Men's Christian Association of New Orleans, the sum of $450,000.00 for the specific purpose of constructing a residence or dormitory to be known as "Milne Y.M.C.A. Residence" or "Alexander Milne Hall" to constitute a memorial in perpetuity to the name of the testator, to provide lodgings (at moderate cost, or no cost if the applicants are unable to pay) for boys and young men.

2. To the New Orleans Area Council, Boy Scouts of America, a sum not in excess of $160,000.00, for the purpose of constructing additional buildings, extending the property, and erecting other facilities conducive to the complete utilization of Camp Salmen, a camp owned, maintained and operated in St. Tammany Parish by the New Orleans Area Council, Boy Scouts of America.

3. To the Administrators of the Tulane Educational Fund, the corporation which operates the Tulane University of Louisiana, the sum of $150,000.00, for the purpose of establishing and/or maintaining two chairs or professorships in the School of Social Work of Tulane University to be known as the "Alexander Milne Chairs", which would constitute a permanent memorial to the name of the testator.

4. To Associated Catholic Charities of New Orleans, a sum not in excess of $50,000.00, for the express purpose of furthering its program of the vocational training of boys at Hope Haven, substantially as presently carried on.

The Trustees alleged in their petition that after diligent search they had found

that there were no heirs of the late Alexander Milne in existence.

The Attorney General for the State of Louisiana was cited,[1] and the following parties intervened:

1. Metropolitan Chapter of the Knights of Columbus;

2. Female Orphan Society, also known as the Poydras Female Asylum;

3. Mrs. J. Skelly Wright, et al.;

4. New Orleans Area Council, Boy Scouts of America;

5. Young Men's Christian Association;

6. Administrators of the Tulane Educational Fund;

7. Associated Catholic Charities of New Orleans, Inc.;

8. Metropolitan Chapter of the Knights of Columbus, No. 714.

After a lengthy trial, at which voluminous testimony was adduced, the trial court rejected plaintiff's demands and rendered the following judgment:

"It Is Ordered, Adjudged and Decreed that the recommendations of the Board of Directors (herein sometimes referred to as Trustees) of the Milne Asylum for Destitute Orphan Boys for the distribution of the balance of the funds on hand to the Young Men's Christian Association, the New Orleans Area Council of the Boy Scouts of America, Tulane University of New Orleans, and Hope Haven, are hereby rejected and disappproved, with full reservation of all other rights; and all interventions are dismissed as in case of non-suit.

"It Is Further Ordered, Adjudged and Decreed that the suggestions or recommendations made to the Directors and/or trustees in the accompanying reasons are not decretale, but advisory only, and cannot become res adjudicata without further proceedings herein."

Plaintiff, Milne Asylum for Destitute Orphan Boys, and Intervenors, Associated Catholic Charities of New Orleans, Inc., Administrators of the Tulane Educational Fund, Young Men's Christian Association, Female Orphan Society (formerly the Poydras Female Asylum), and New Orleans Area Council, Boy Scouts of America, appealed from the judgment rendered.

1. LSA–Revised Statutes 9:2332(2) provides:

" * * * if no heir in intestacy or special or universal legatee is present or can be found within the state of Louisiana, then, and in such event, such service shall be made upon the Attorney General of the state of Louisiana, and in such case proceedings carried on contradictorily with the said Attorney General shall, for all purposes, be as fully as effective and valid as if the individual heirs in intestacy or legatees had been personally served * * * the Attorney General * * * shall show cause why the prayer in the petition shall not be granted."

Briefs were filed by these Appellants and by Appellees, Mrs. J. Skelly Wright, et al., the Attorney General of the State of Louisiana, and the New Orleans Metropolitan Chapter of the Knights of Columbus. The City of New Orleans was not a party to the proceedings, but a brief was filed by the City Attorney for the City of New Orleans as Amicus Curiae. The State of Louisiana is making no claim to any of the funds.

LSA–Revised Statutes 9:2331 et seq.[2] is listed under the heading of trusts for charitable purposes and introduces the "Cy Pres" doctrine into Louisiana Law. This Act, 592 of 1954, provides that where, after the execution or probate of a will containing a trust or conditional bequest for charitable, educational or eleemosynary purposes, circumstances make it impractical, impossible or illegal to literally comply with the terms of the will, the court may render a judgment directing that such charitable trust, devise, or conditional bequest shall be administered or expended in such a manner as will most effectively accomplish as nearly as practicable under existing conditions the general purpose of the trust or will.

In 10 Am.Jurisprudence, Charities, sec. 129, p. 680, we find the following pertinent statement:

2. LSA–R.S. 9:2331 provides:
"In any case in which circumstances have so changed since the execution or probate of a will containing a trust or conditional bequest for charitable, educational or eleemosynary purposes so as to render impractical, impossible or illegal a literal compliance with the terms thereof, the district court having jurisdiction of the succession of the testator (and in the parish of Orleans, the civil district court) may, upon petition of a trustee, or of the person or corporation having custody or possession of the property subject to said trust or conditional bequest, or of any heir or legatee who in the absence or invalidity of such trust or conditional bequest would have been entitled to any part of the property contained therein, in accordance with the procedure hereinafter set forth, enter a judgment directing that such charitable trust, devise, or conditional bequest, shall be administered or expended in such manner (either generally or specifically defined) as, in the judgment of said court, *will most effectively accomplish as nearly as practicable under existing*

*conditions the general purpose of the trust or will*, without regard to and free from any specific restriction, limitation or direction contained therein." (Italics ours.)
LSA–R.S. 9:2334 provides:
"The said district court shall thereupon enter a judgment in the premises and may direct that such trusts or devises or conditional bequests shall be administered or expended in such a manner, or manners as will most effectively accomplish, as nearly as practicable under existing conditions, the general purpose of such trust, devise, or conditional bequest without regard to and free from any specific restriction, limitation or direction contained therein, provided, however, that in the absence of a clearly expressed intention to the contrary no such trust, devise or conditional bequest for charitable, education or eleemosynary purposes shall be invalid because the specific method provided by the testator for the accomplishment of the general purpose indicated by him is or becomes, for any reason, impractical, impossible or unlawful; * * *."

"Where the terms of a gift in trust for charitable purposes were originally precise and complete, but have, by lapse of time or otherwise, become unsuited under the altered circumstances to carry out the general intent of the founder, a court of equity may regulate the funds of the charity. Thus, if the fund turns out to be inadequate for the accomplishment of the designated purpose, the court may apply the fund cy pres. * * *

"The rule of equity on this general subject seems to be clear that, when a *definite charity* is created, the *failure of the particular mode* in which it is to be effectuated does not destroy the charity; for equity will *substitute another mode,* so that the substantial intention shall not depend upon the formal intention. The doctrine of cy pres adopted to this extent is in harmony with the equitable rule that a liberal construction is to be given to charitable donations to accomplish the general charitable intent of the donor.

Thus the court to carry out the testator's intentions, will execute the trust cy pres by sanctioning a scheme to modify it, even though it requires elimination of a subsidiary condition, compliance with which has become impracticable. A slight departure from the letter of the will in regard to the place where the charity is to be conducted is of no more consequence than a variation from the prescribed mode in which it shall be conducted, where there is no provision for the forfeiture, since the absence of a provision for a forfeiture in case of noncompliance with a direction in a will with regard to a charitable trust shows that the testator did not intend that the gift should revert on failure to comply therewith while the carrying out of his general purpose is practicable." (Italics ours.)

■ Our research leads us to the conclusion that the doctrine of cy pres as applied in the United States is the doctrine of approximation. 10 Am.Jur., Charities, sec. 123, p. 676.[3] The doctrine of approxi-

---

3. "With a few exceptions, under the system of equity jurisprudence adopted in America, the powers exercised by our courts are purely judicial, derived solely from the organic law and the statutes, including the common law and the Statute of Elizabeth; the doctrine of administering trusts cy pres or under the prerogative of the King by sign manual has no part or place in the administration of the courts either at law or in equity in the United States.

"The doctrine of cy pres as applied in the United States is the doctrine of approximation. It is not peculiar to the administration of charities, but is equally applicable to all devises and contracts wherein the future is provided for; and it is an essential element of equity jurisdiction. In its last analysis it is found to be a simple rule of judicial construction, designed to aid the court to ascertain and carry out, as nearly as may be, the intention of the donor. In apply-

mation is a Civil Law doctrine which has been long recognized in Louisiana. In Succession of Vance, 39 La.Ann. 371, 2 So. 54, we said:

"The supreme court of this state has, in a memorable litigation, well said that legacies of this class are known to the civil law, from the formation of Christianity, as legacies for pious uses, and are an element in the polity of municipal administration in all countries which have preserved the features and jurisprudence of Roman civilization. They are highly favored by law on account of their motives for sacred usages, and their advantage to the public weal; and the great consideration which the law attaches to these legacies controls tribunals in their interpretation of them, and has secured for their support a doctrine of approximation which is coeval with their existence. McDonogh's Will, 8 La.Ann. 246."

In Louisiana, we have consistently held that:

"Our Code has long ago recognized and laid down the wise rules which prevail in all civilized countries, and which have been steadily followed as much as practicable, namely: that in the interpretation of wills the intention of the testator must be principally endeavored to be ascertained, and that a disposition must be understood in the sense in which it can have effect, rather than in that in which it can have none. Rev.Civil Code, arts. 1712, 1713." Succession of Vance, supra. See, also, Succession of Rougon, 223 La. 103, 65 So.2d 104; Succession of Earhart, 220 La. 818, 57 So.2d 695; Succession of Fertel, 208 La. 614, 23 So.2d 234; Succession of Montegut, 217 La. 1023, 47 So.2d 898.

■■ An analysis of the dispositions of Milne to the institutions named in his will makes it clear that his primary purpose and intent was the relief of destitute orphans. The mode in which this charitable bequest must be carried out, that is by the construction of an asylum for boys at Milneburg to be named "Milne Asylum", is secondary. If Milne's primary intent to provide for the relief of orphan boys cannot be carried out in the manner designated by him, it may be carried out in some other manner, under the doctrine of equitable approximation or under the cy pres doc-

---

ing the doctrine of approximation, the American courts have not the same freedom of action that was possessed by the English courts when acting under the prerogative right. A charitable trust must have, under the American theory, elements of definiteness and certainty not required under the prerogative theory."

An interesting discussion of the "Cy Pres Doctrine" and the "Equitable Doctrine of Approximation" will be found in National Bank of Greece v. Savanka, 167 Miss. 571, 148 So. 649.

trine, but his primary intent can never be disregarded.

Before we consider the proposed distribution of the funds by the Trustees, we must discuss the contentions of The Female Orphan Society (formerly the Poydras Female Asylum). If its contentions are well founded, that institution is entitled to the legacy as a matter of law. Counsel argues that The Poydras Female Asylum was a conjoint legatee of Milne of the lands in question; that the legacy has lapsed, or should now be annulled, rescinded and revoked, because of the averred violation of the condition imposed by the testator; that The Female Orphan Society (formerly The Poydras Female Asylum) is a universal residuary legatee under a conjoint legacy, and as such is entitled to all or at least one-fourth of the funds now available for distribution; that the legacy is different from those considered in the cases of Succession of Lambert, 210 La. 636, 28 So.2d 1, and Succession of Rou-

gon, 223 La. 103, 65 So.2d 104; and, alternatively, under the doctrine of cy pres, The Female Orphan Society should be awarded all or at least one-fourth of the funds now available for distribution.

■ If we examine the legacies involved in this case, we find that the testator specifically divided the lands on Bayou St. John and on Lake Pontchartrain among the four legatees and bequeathed them "in equal shares or interests of one-fourth to each." Likewise, he named the same four institutions his "universal heirs and legatees in equal shares or portions" and bequeathed the residue of his estate to them with the specific provision that it was "to be equally divided and apportioned among them."

■ The legacies, therefore, were not conjoint legacies, and accretion, as provided by Article 1707 [4] of the LSA–Civil Code does not apply. Succession of Lambert,[5] supra [210 La. 636, 28 So. 8]; Suc-

---

4. "Accretion shall take place for the benefit of the legatees, in case of the legacy being made to several conjointly.

"The legacy shall be reputed to be made conjointly when it is made by one and the same disposition without the testator's having assigned the part of such co-legatee in the thing bequeathed."

5. "By giving effect, therefore, to all of the words of the will in question as must be done, especially those in the controversial clause, and by interpreting them reasonably using their popular and ordinary meaning, the conclusion is inescapable that the testator when employ-

ing the phrase 'share and share alike' deliberately and definitely divided the residue of the estate between his brothers, Albert and Robert Lambert, leaving it to them in the proportion of one-half to each; he, in other words, assigned the part of each colegatee in the thing bequeathed. It follows logically that the legacy is not governed by the above discussed exception (R.C.C. Art. 1707) to the general rule respecting testamentary accretion (R.C.C. Art. 1706), and that the lapsed portion bequeathed to Albert Lambert devolves upon the legitimate heirs of the testator (R.C.C. Art. 1709).

"To reach a contrary conclusion, that

cession of Rougon, supra. The property was susceptible of division without deterioration, and Article 1708 [6] of the LSA–Civil Code is, likewise, not applicable.

The contention that the legacy has lapsed is, likewise, without foundation. In 1841, in the case of Milne's Heirs v. Milne's Executors, supra, we held that the donations to the two Milne Asylums were conditional donations, and that the capacity to take the legacies was created as soon as the condition was fulfilled by incorporating the asylums. Therefore, in 1839, when the Louisiana Legislature incorporated Milne Asylum for Destitute Orphan Boys and the home was constructed, the legacy became vested. Succession of Vance, supra.[7] The legacy did not lapse, because there was a fulfillment of the condition imposed by the testator, and the asylum remained in operation until the Civil War. Prevailing conditions and circumstances made it impossible for the Trustees to build another asylum during the years following the Civil War. After prudent administration of the funds entrusted to them, the Trustees are now attempting, through the doctrine of cy pres, to secure the Court's assistance in carrying out the testator's wishes. Since this doctrine or the doctrine of approximation is applicable, the legacy is not subject to revocation or annulment.

Therefore, as a matter of law, The Female Orphan Society (formerly the Poydras Female Asylum) is not entitled to the legacy, or any part thereof, made to the Milne Asylum for Destitute Orphan Boys. Its claim for consideration under the cy pres doctrine will now be considered with those of the other Intervenors.

---

is that the testator did not assign the part of each colegatee, is to disregard or to delete from the will the 'share and share alike' phrase in contravention of the above mentioned cardinal rule of testamentary interpretation. * * *"

6. "It shall also be reputed to be made conjointly when a thing, not susceptible of being divided without deterioration, has been given by the same act to several persons, even separately."

7. In that case we said [39 La.Ann. 371, 2 So. 56]:

"The executor puts himself out of court, by the very attitude which he assumes when he charges that the legacy has returned to the succession, by reason of the discontinuance of the asylum. He thereby impliedly admits that the legacy has passed from the succession to the legatee, but insists that it has returned. This cannot be under our system of law, which forbids giving and not giving. Had the testatrix thus stipulated, however, that condition, being prohibited, would have been illegal, and as such dealt with or reputed as not written. If the legacy has passed, as it surely has, then the succession has been divested absolutely, and the legatee has acquired. An unconditional legatee cannot, after vesting, be divested under any contingency. It is, therefore, clear that, although the insane asylum was not incorporated, the legacy could take effect, and that it has passed from the succession of the deceased to the city of New Orleans for the use and benefit of her indigent insane."

As previously stated, Milne's intent was to assist and help destitute orphans. The Trustees are of the opinion that the present trend is away from orphan asylums, as such; that the number of orphans is constantly decreasing; and, that under the doctrine of cy pres their proposals would accomplish very closely the charitable intent and purpose of the donor.

■ Alexander Milne used the word "orphan" in his will as a descriptive term. Hence, used in such a sense, we believe he meant children bereft of protection or advantage. Webster's New International Dictionary, 2nd Edition.[8] From the testimony of record, we are convinced that the concept of an orphan includes a child whose parents abandon or neglect him. Such is equivalent to orphaning the child, for he no longer has parental shelter and care. County Bank & Trust Company v. Neeld, 32 N.J.Super. 124, 108 A.2d 28.

Miss Mary Raymond, Director of the Department of Public Welfare in New Orleans until 1939 and presently Executive Director of the Council of Social Agencies, testified that in the City of New Orleans there are twenty-three institutions devoted to the care of children, four of which are maternity homes and five of which render specialized services. She stated that the Jewish Children's Home and the Episcopalian Children's Home have been abandoned as homes for institutionalized care. She further stated that there are twelve institutions in the City, which are devoted to the care of dependent and neglected children, and that in these twelve homes there is a daily population of 696; that in 1930 there were 1,457 children daily, in 1940 there were 1,091 children daily, in 1950 there were 753 children daily, and in 1954 there were 696 children daily; that the cost of maintaining a child in an institution ranges from $1.60 to $2.50 per day. Miss Raymond stated that these homes do not use, as a criteria for admission, the fact that a child is an orphan in the strict sense of the word; that children are placed in homes because they need group care. She listed the following as the twelve institutions:

1. Bethlehem Lutheran and Welfare Association;

2. German Protestant Orphans' Asylum;

3. Hope Haven;

4. Lafon Home for Boys;

5. Madonna Manor;

6. St. Elizabeth's;

7. Poydras Home;

8. Protestant Children's Home, now called Protestant Orphans' Home;

9. Roberson Memorial Home;

8. Orphan (b) Hence, one bereft of some protection or of some advantage.

10. Sacred Heart Orphanage;

11. St. John Berchman's Asylum; and

12. Waldo Burton Memorial Home.

Miss Raymond omitted St. Vincent's Infant Asylum from the list, becaute of its specialized care. She said, however, that her statement, as to the present population of 696 daily, included St. Vincent's Infant Asylum and Milne Municipal Boys' Home.

Miss Raymond further stated that the Homes mentioned receive a large amount of their operating expenses from the Community Chest. She was of the opinion that there is no need for additional institutions, since there are vacant beds in the institutions now in operation, but that there will always be a need for institutionalized care. She stated that 5.4% of the population of New Orleans children under eighteen were orphans or one-half orphans in 1953. She gave as reasons for the decrease of children in institutions, foster homes, federal aid to parents, and strides in medical science lengthening the lives of parents. She stated that great strides have been made in the field of foster homes; that these homes require no capital investment and they are given $50.00 a month to keep a child. The Federal Government contributes to these payments.

Mr. Sanford Weiss, Ex. Director of the Jewish Children's Home of New Orleans, testified that there is no specific Jewish orphanage in the City of New Orleans, and that the home here is a regional institution.

Father Fred Digby, Director of Associated Catholic Charities, testified that Hope Haven takes care of dependent and neglected boys of the white race and Catholic religion, from twelve to seventeen years of age, and that it specializes in vocational guidance and manual training, as well as formal education. It was his opinion that a boy was an orphan when his parent or parents abandoned him. Father Digby stated that his institution has substituted the word "dependent" for "destitute". He further stated that there were approximately 85 boys at Hope Haven, and that the 1954 cost of $2.96 per boy per day came from the Community Chest and private donations.

Monsignor Herman J. Jacobi, Consultant to the Archbishop on charities and welfare, testified that there are ten institutions in the City of New Orleans caring for needy and destitute children. He said that there were 537 boys and 705 girls in these institutions at the end of 1954; that in 1950 there were 1,181 boys and girls taken care of in institutions; and, that in the five year period 2,462 boys and 3,290 girls had been taken care of in these ten institutions. He testified in detail as to Madonna Manor, which institutionalizes younger boys than those at Hope Haven. He was of the opinion that the foster home program was of great merit, but that in many instances it

was not workable because of personal lack of adaption.

The testimony of Monsignor Jacobi, Father Digby, and Miss Raymond, all qualified social service and child welfare consultants, convinces us that there are many orphans, as well as dependent, destitute and neglected children, in the City of New Orleans, and that there is a present need, which shows no sign of becoming extinct, for institutional care.

■ We agree with the trial judge in his conclusion that:

"There are still destitute orphans among us of all races and creeds, who are in need of care; * * *"

While the present social concept is that it is better to place orphans in foster homes than to keep them indefinitely in orphan asylums, we cannot ignore the fact that orphans must be kept in community homes until they are placed in foster homes and that many of them are never placed at all. We find that there still exists a class of children in the City of New Orleans, which Milne intended to benefit, and that there is need for institutions to house them.

The Young Men's Christian Association, Intervenor-Appellant, urges that it conducts a well-rounded program for male youths of the community of New Orleans, including counseling facilities, housing facilities and health programs. It states that additional dormitory facilities would furnish living quarters at moderate cost, or no cost, with healthful, moral and properly supervised surroundings to young men coming to New Orleans to establish themselves.

The Administrators of the Tulane Educational Fund argue that destitute, neglected and orphaned children require the guidance of trained social workers, and that a disposition to the University for the benefit of instructors in social science would accomplish the purpose of assisting children in institutions.

The New Orleans Area Council, Boy Scouts of America states that a sizeable donation as contemplated by the Trustees would enable it to provide additional camp facilities for underprivileged boys.

The Young Men's Christian Association, Tulane University, and the Boy Scouts of America are all great institutions, and the proposed distribution of Milne funds to them would be for very worthy causes. However, none of these institutions care for destitute orphans, and we cannot find that the suggested donations to them carry out the intention of the testator.

Associated Catholic Charities, Inc. contended in their intervention and in this Court that Hope Haven is the type of institution the testator intended to benefit, and that the Trustees' recommendation to donate $50,000 to Hope Haven should be given effect. Father Digby testified that

the institution is in dire need of repairs. He further stated that a proper memorial would be dedicated to Alexander Milne should the donation be given to Hope Haven.

▨ We believe that Hope Haven is an institution of the nature and kind that Alexander Milne wanted to help. However, the trial judge was correct in dismissing the intervention of Hope Haven as of non-suit, because his dismissal of the Trustees' recommendations as to the other three suggested donees affects the amount this institution could receive, and, as hereinafter pointed out, there are other institutions equally eligible.

In their intervention and in this Court Mrs. J. Skelly Wright, et al., urge that there is no need for the application of the cy pres doctrine in the instant case because:

1. "Milne Municipal Boys Home constitutes fulfillment of Mr. Milne's Will in that it is an institution created with money from the fund controlled by the Milne Asylum for Destitute Orphan Boys; is built on Milne land either at Milneburg or adjacent thereto; must care for destitute orphan boys under its contract with the Milne Asylum for Destitute Orphan Boys, and bears Mr. Milne's name.

2. "There is an urgent need for improvements at the Milne Municipal Boys Home."

In its Amicus Curiae brief filed in this Court, the City of New Orleans argues:

"However, it is our opinion that this money should be given for the purpose of erecting needed capital improvement at Milne Municipal Boys' Home. We believe that when the predecessors of the current Board of Directors of the Milne Asylum donated the sum of $80,000.00 for the erection of Milne Municipal Boys' Home and granted them a lease for the period of ninety-nine years on the Milne Property that it was their intention to comply with the terms of Mr. Milne's will. That this institution, as it exists today can be the only recipient of the funds now on hand by the Board of Directors. The fact that this institution is now tax supported does not preclude its receiving funds for needed capital improvements, nor is it against public policy for the City of New Orleans or any other municipal corporation to receive funds from donors for specific purposes."

Miss Raymond testified that in 1954 there were approximately 16 children a day in the Milne Municipal Boys' Home, who were not delinquent. These were children in the custody of the Juvenile Court, who were sent to the home by the Department of Welfare, but they were not charged with delinquent acts.

Mr. Dahlgren, Supervisor of Milne Municipal Boys' Home, testified that the home has a $700,000 need for capital improvements, and that its annual budget is $180,000 per year. He stated that the average population of this institution is 110 boys. In 1954, there were 132 boys. At the time of trial there were 141 boys—65% were negroes, 31% of the group was non-delinquent, 24% came from the Juvenile Court, and 7% were admitted under the terms of the Milne will. Mr. Dahlgren stated that serious delinquents are not kept at Milne; that they are sent to State institutions. He said that the plaintiffs made no requests in his nine and a half years at the institution.

▇▇▇ We do not think that the testator intended to make his donations to delinquent boys. We are convinced by the record that there are a number of needy, neglected and destitute boys at Milne Municipal Boys' Home, in need of institutional care, who are not delinquent. The present method of combining delinquents and destitute boys does not comply with the testator's wishes, even though the institution bears his name. See, In re Pearsons' Estate, 113 Cal. 577, 45 P. 849, 1062.

If the Trustees can enter into a new arrangement with the City of New Orleans, whereby delinquent boys will be removed from the Milne Home and its use confined to destitute orphan boys, that would meet substantially all the requirements of the Milne will. We do not think that the action of the Department of Public Welfare, in resolving not to interfere in this litigation, forecloses the City from accepting and receiving all or part of the legacy for that purpose, if the Trustees would prefer not to operate the institution themselves.

▇▇▇ New Orleans Metropolitan Chapter, Knights of Columbus, Intervenor-Appellee, which has no direct interest in the outcome of this litigation and has appeared in this proceeding more in the position of an Amicus Curiae, has suggested this solution in its brief:

"* * * If The Funds Of This Trust Are To Be Expended Cy Pres, Every Dollar Now In The Hands Of The Trustees Should Ultimately Be Applied To Aid The Destitute, Needy And Neglected Children Of This Community. There are twenty-one or more institutions in this city caring for such children. They are not supported from public funds. They participate in the annual United Fund drive but the support received from this source is for operational costs only and is usually below the minimum needs of the institutions. Many of the buildings and facilities used by these institutions are old and in need of major repairs. All of these facts were established by testimony at the trial of this matter.

"We respectfully suggest to this Honorable Court, as we did to the trial court, that perhaps the most effective way of accomplishing the general charitable purpose and intent of the testator, Alexander Milne, would be to distribute the funds of this trust on a proportionate or per capita basis to all of the institutions in New Orleans caring for so-called dependent children. As a condition precedent to the allotment of funds to each such charitable institution, it might be required that the institution agree to memorialize the name of Alexander Milne in some proper and fitting manner."

In the event no satisfactory agreement can be reached between the Trustees and the City of New Orleans, under the terms of which the Milne Municipal Boys' Home would house only destitute orphan boys— so as to qualify that institution to meet the terms of the will—undoubtedly the above suggestion that the funds be distributed among those institutions that care for destitute orphan boys, or any one or more of them, would meet the primary intent of the testator and would be proper under the cy pres doctrine.[9]

The Female Orphan Society (formerly The Poydras Female Asylum) can be given consideration under the cy pres doctrine only if it is found that there are not a sufficient number of orphan boys to whose care the funds in the possession of the Trustees may be devoted. That institution has already received its legacy for the care of orphan girls, and the Funds in the hands of the Trustees were primarily intended for the care of destitute orphan boys.

We must amend the decree of the District Judge to conform to our views expressed herein. The judgment is, accordingly, amended to read as follows:

It Is Ordered That the petition of the Trustees of the Milne Asylum for Destitute Orphan Boys, and the interventions of the Young Men's Christian Association of New Orleans, the New Orleans Area Council, Boy Scouts of America, the Administrators of the Tulane Educational Fund, and the Female Orphan Society, also known as The Poydras Female Asylum, be rejected;

It Is Further Ordered That the demands of all other Intervenors be dismissed as in case of non-suit; and

9. In Succession of Vance, supra, the legacy was to "The Insane Asylum", an unincorporated institution under control of the City of New Orleans. This institution was discontinued before the acceptance of the legacy, when the inmates were transferred to the State Insane Asylum at Jackson, Louisiana. Thereafter, the City provided for the detention of the indigent insane in the Louisiana Retreat, a private institution caring for persons afflicted with mental illness, and paid the cost thereof. In that case we held that, under the doctrine of approximation, the City could claim the legacy and pay the proceeds thereof to the Louisiana Retreat for the care of the City's mental patients.

It Is Further Ordered That the matter be referred back to the Trustees of the Milne Asylum for Destitute Orphan Boys for further consideration in accordance with the views herein expressed.

As thus amended, the judgment of the District Court is affirmed; all costs to be paid by the Trustees of the Milne Asylum for Destitute Orphan Boys out of the trust funds.

FOURNET, C. J., absent.

HAMITER, J., recused.