**IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI**

**NO. 2023-CA-00707-COA**

| | |
|---|---|
| **IN THE MATTER OF THE ESTATE OF ELIJAH FORKNER, DECEASED: MIMI FORKNER BERRY** | **APPELLANT/ CROSS-APPELLEE** |

**v.**

| | |
|---|---|
| **TAMIKA FORKNER AND BETSY RANDOLPH** | **APPELLEES/ CROSS-APPELLANTS** |

DATE OF JUDGMENT: 05/25/2023
TRIAL JUDGE: HON. TIFFANY PIAZZA GROVE
COURT FROM WHICH APPEALED: HINDS COUNTY CHANCERY COURT, FIRST JUDICIAL DISTRICT
ATTORNEYS FOR APPELLANT: EDWARD BLACKMON
BARBARA BLACKMON
BRADFORD JEROME BLACKMON
ATTORNEY FOR APPELLEES: PAUL E. ROGERS
NATURE OF THE CASE: CIVIL - WILLS, TRUSTS, AND ESTATES
DISPOSITION: ON DIRECT APPEAL: AFFIRMED.
ON CROSS-APPEAL: AFFIRMED IN PART; REVERSED AND REMANDED IN PART - 12/03/2024
MOTION FOR REHEARING FILED:

**BEFORE BARNES, C.J., SMITH AND EMFINGER, JJ.**

**EMFINGER, J., FOR THE COURT:**

¶1.     This appeal stems from a disagreement regarding the construction of the holographic will of Elijah Forkner. After Elijah's death on June 26, 2020, his daughter Mimi Forkner Berry filed a petition to name herself executrix and to admit the will for probate. Her sisters, Tamika Forkner and Betsy Randolph, objected to the probate of the will, arguing that the will was invalid and that even if it were valid, it was procured by the undue influence of Mimi.

After considering the evidence and pleadings and hearing testimony and the arguments of counsel, the chancellor found that the will met the requirements of a holographic will and was not the product of undue influence. In its judgment, the trial court gave effect to those parts of the will it found to be clear and unambiguous. However, the trial court also found that certain portions of the will were ambiguous and unenforceable. The property in those portions, the trial court found, should pass pursuant to the laws of intestate succession. Mimi appealed, and Tamika and Betsy filed a cross-appeal.

## FACTS AND PROCEDURAL HISTORY

¶2.     Elijah Forkner was a resident of Hinds County, Mississippi, when he died on June 26, 2020. Elijah's wife, Juanita, died in 2019. He had seven adult children, who the chancery court determined were his only heirs at law: daughters Mimi Berry Forkner, Tamika Forkner, Betsy Randolph, Gertrude Lawrence, and sons Gregory Lawrence, Jewell Forkner, and Winfred Forkner. Prior to his death, Elijah composed a handwritten document that provided:

To whom

> I want Mimi Kaye to have 100%
> say when it come to my well-being.
> I want my 35 acres of land to
> stay as is, not to be divided. (no selling)
> When trees are solded, each one of three,
> Mimi, Betsy, & Tamika to get equal parts
> I am leaving my house and its contents
> to Mimi.
> My tools, tractor, cars, truck, Boat, SUV
> goes to Mimi. Mobile home goes to EJ.
> My gun collection goes to Mimi.
> My AR15 goes to Greg (son).

The document was dated May 19, 2020, and signed by Elijah Forkner. The handwritten

2

document was contained in a spiral notebook.

¶3.     Attorney Ronald Craig Morton testified at trial. Morton had represented the Forkners before when Elijah's wife, Juanita, began to suffer from poor health in late 2018 and 2019. According to Morton, the goal at that time was asset protection. Morton testified that he met with the family at least four times and that during most of those meetings, Elijah, Mimi, Tamika, and Juanita were present. As a result of these meetings, Morton prepared several different documents for Elijah and Juanita while planning for Juanita's end-of-life care and the protection of their assets.

¶4.     Morton testified that he had drafted documents for Elijah in the event that he predeceased his wife and his wife was in a nursing home. The documents established a testamentary trust that would be Medicaid-protected and, thereafter, would distribute assets equally among the three daughters. Morton testified that Elijah was given the opportunity to sign the documents, but he refused to execute those documents.

¶5.     After the death of his wife, Morton had a telephone conversation with Elijah, during which Elijah advised Morton that he needed to finish up his "will" or "plan." This was in late March or early April 2020. When Morton discovered that Mimi was on the call, Morton stopped the conversation and told Elijah that he needed to make an appointment with Morton on his own, drive himself to the appointment, and meet with Morton one on one.

¶6.     Elijah and Morton met on May 19, 2020. Morton confirmed that Elijah had made the appointment himself and had driven himself to the appointment. At that time, Morton had known Elijah for about two years. According to Morton, Elijah was "sharp," "knew what he

wanted," "knew what his plan was," and knew what he did not want.

¶7.    Elijah brought the spiral notebook containing the handwritten document to the meeting with Morton. Morton testified that he recognized Elijah's signature on the document. According to Morton, during the course of the meeting, Elijah referred to the handwritten document as his "will" twice.[1]

¶8.    After the May 19, 2020 meeting, Morton prepared a power of attorney, financial power of attorney, healthcare power of attorney, advanced healthcare directive, HIPAA release, a pour-over will, and an irrevocable trust. Morton testified that he did not use the document at issue as the basis for those documents but, rather, used the record of his conversation with Elijah. When specifically asked whether Elijah told him that he wanted to establish a trust, Morton said that Elijah did not use those words but relied upon him to design a plan that would accomplish his wishes. Morton indicated that Elijah wanted his thirty-five acres to stay as is and not to be divided or sold. In Morton's view, the best way to accomplish that intention was to place the land in a trust. Morton said that Elijah wanted Mimi to be in charge, so he drafted the documents accordingly. Although the documents Morton prepared were introduced into evidence, Elijah died on June 26, 2020, without having reviewed or executed the documents.

¶9.    This dispute began on July 27, 2020, when Mimi filed a petition for the appointment of an executrix and for letters of administration of Elijah's estate. She submitted the handwritten document dated May 19, 2020, as Elijah's holographic will. On August 11,

_____

[1] Morton also testified that when he asked Elijah if he already had a will, he handed him the spiral notebook containing the handwritten document.

2020, Winfred Forkner, Elijah's son, filed a petition contesting the will and its probate, alleging the "purported" will was invalid and that it should be "set aside, because it was not executed according to the appropriate formalities required by Mississippi law." On September 8, 2020, two of Elijah's daughters, Tamika Forkner and Betsy Randolph, also filed an objection to the probate of the handwritten document. They alleged that the document was not a valid will and, if it were found to be valid, that it was the product of undue influence on the part of Mimi.[2]

¶10.    Tamika and Betsy also filed a motion for accounting, inventory, and the immediate removal of Mimi from Elijah's home, alleging that Mimi had moved into the "estate house," treating it as her own, and that Mimi had denied Tamika and Betsy entry into the home. They contended that by taking control of the house, Mimi had also taken control of Elijah's personal property. They asked the trial court to remove Mimi from the home and to grant Tamika and Betsy equal access to the estate home during the pendency of the litigation.

¶11.    On September 28, 2020, Mimi filed her responses to Winfred's petition contesting the will and to Tamika and Betsy's motion for accounting and objection to probate of the will, all in the form of a general denial.[3]

¶12.    On November 5, 2020, Mimi filed a memorandum in support of Elijah's holographic will, and on November 9, 2020, Tamika and Betsy filed their memorandum in opposition. On December 7, 2020, after reviewing the pleadings and hearing the testimony and the

---

[2] While Tamika and Betsy asserted undue influence throughout the litigation, they do not raise the issue on appeal.

[3] All three responses were amended on September 29, 2020.

arguments of counsel, the chancellor entered an order granting Mimi's petition for appointment as executrix and for letters of administration. The chancellor admitted the handwritten document dated May 19, 2020, to probate as the last will and testament of Elijah, as it "appear[ed] to meet the requirements for a holographic will, as set forth in Mississippi Code Annotated § 91-5-1 (2011)." On December 14, 2020, Tamika and Betsy filed a motion for reconsideration, still alleging that the document did not meet the requirements for a valid holographic will, that the signature on the document did not appear to be Elijah's, and that the body of the document and the signature were in two different ink colors. Tamika and Betsy also asked the chancellor to give them time to have the document examined by a handwriting expert.[4]

¶13.     On February 23, 2021, Tamika and Betsy filed a motion to require Mimi "to file an inventory of the assets of the Estate and an accounting of all funds passing through the Estate from the time of the decedent's death to the present and enjoining disposition and/or use of Estate assets." The next day, they filed a "Caveat Against Probate of Last Will and Testament of Elijah Forkner and Motion for Construction of Will." On September 17, 2021, Mimi filed a petition providing an inventory of the estate, a first accounting, a request to pay the probated claims against the estate, a request for Mimi to be reimbursed for her payment of "property taxes, insurance, repairs, bush hogging, car tags and general maintenance of the properties to preserve the estate," and a request to pay the attorney's fees of Blackmon &

---

[4] Mimi responded to the motion for reconsideration on December 23, 2020; however, in their appellate brief, Tamika and Betsy state that whether the handwritten document Mimi presented to probate was in the handwriting of Elijah and subscribed by him at the bottom is not an issue on appeal.

Blackmon PLLC.

¶14. On December 1, 2021, Tamika and Betsy filed a motion for findings of fact and conclusions of law relating to the chancellor's order admitting the will to probate and the denial of their motion for reconsideration. On December 6, 2021, they filed a motion for construction of the will and asked the chancellor to find that the handwritten document was not effective to convey Elijah's property and that Elijah had died intestate. Mimi responded on January 28, 2022.

¶15. Mimi filed an amended petition for inventory, accounting, authorization to pay claims of estate, costs of administration, and closing of the estate on January 27, 2022.[5] Tamika and Betsy filed their objection on February 28, 2022. They argued that closing the estate was premature because there had "been no adjudication of the Caveat Against Probate filed by [Tamika and Betsy[6]] and no construction of the purported Last Will and Testament of Elijah Forkner . . . both of which must be resolved before this Estate can be closed."

¶16. On September 30, 2022, Tamika and Betsy filed their proposed findings of fact and conclusions of law relating to their objection to probate of the will and their caveat against probate in two separate documents. Mimi filed her proposed findings of facts and conclusions of law the same day and supplemented them on November 28, 2022.

¶17. On May 9, 2023, the chancellor entered a final judgment finding no "suspicious circumstances surrounding the creation of the will" sufficient to raise a presumption of undue

---

[5] The petition was amended again on November 9, 2022.

[6] Mimi responded to the caveat on August 22, 2022.

7

influence on Mimi's part; moreover, the chancellor found that there was no abuse of the relationship between Mimi and Elijah. The chancellor declined to consider the first clause of the handwritten document, finding it did not "pertain to any testamentary disposition." The chancellor also found the second and third clauses of the document were ambiguous, and because of those ambiguities, had held a full hearing on the issue of construction.

¶18.    The chancellor concluded:

> The following provisions of the will are not ambiguous and can be accomplished: "The decedent's tools, tractor, cars, truck, boat, and SUV goes to Mimi. The mobile home goes to E.J. The gun collection goes to Mimi. The AR15 goes to Greg." The remaining provisions of the will fail and pass pursuant to the laws of intestate succession.
>
> > Mississippi Code Ann. § 91-1-3. Descent of land
> > When any person shall die seized of any estate of inheritance in lands, tenements, and hereditaments not devised, the same shall descend to his or her children, and their descendants, in equal parts, the descendants of the deceased child or grandchild to take the share of the deceased parent in equal parts among them.
> >
> > Mississippi Code [Ann.] § 91-1-11. Personal estate to descend as real estate.
> > When any person shall die possessed of goods and chattels or personal estate not bequeathed, the provisions of Section 1 of this act are applicable in determining whether a child of a decedent is living at the time of the decedent's death.
>
> Accordingly, the children shall inherit, in equal parts, all assets of the estate not specifically listed above.

## STANDARD OF REVIEW

¶19.    In *Gray v. Johnson*, 382 So. 3d 545, 550 (¶19) (Miss. Ct. App. 2024), we explained:

> "We will not disturb a chancellor's findings of fact unless they are manifestly wrong or clearly erroneous or the chancellor applied the wrong legal standard." *Ward v. Cranford*, 365 So. 3d 308, 314-15 (¶18) (Miss. Ct. App.

8

2021); *see also Catlett v. Catlett*, 358 So. 3d 366, 375 (¶44) (Miss. Ct. App. 2023). However, questions involving the construction and interpretation of contracts or wills are questions of law that we review de novo. *Id*. at 315 (¶18); *see also Neill v. Earls*, 343 So. 3d 1071, 1076 (¶8) (Miss. Ct. App. 2022) ("When reviewing a chancellor's legal findings, particularly involving the interpretation or construction of a will, this Court will apply a de novo standard of review.").

## ANALYSIS

¶20.    Mimi appealed, and Tamika and Betsy cross-appealed. We will address the issues raised by both separately below.

> **I.      Whether the trial court abused its discretion by admitting the handwritten note to probate as the holographic last will and testament of Elijah Forkner.**

¶21.    On cross-appeal, Tamika and Betsy contend that the handwritten document Mimi presented to probate was never intended by Elijah "to [be] a testamentary disposition of his estate and fails to make a complete and effective testamentary disposition of his estate, even as to the assets identified in the note." Mississippi Code Annotated section 91-5-1 (Rev. 2021) governs holographic wills:

> Every person eighteen (18) years of age or older, being of sound and disposing mind, shall have power, by last will and testament, or codicil in writing, to devise all the estate, right, title and interest in possession, reversion, or remainder, which he or she hath, or at the time of his or her death shall have, of, in, or to lands, tenements, hereditaments, or annuities, or rents charged upon or issuing out of them, or goods and chattels, and personal estate of any description whatever, provided such last will and testament, or codicil, be signed by the testator or testatrix, or by some other person in his or her presence and by his or her express direction. Moreover, if not wholly written and subscribed by himself or herself, it shall be attested by two (2) or more credible witnesses in the presence of the testator or testatrix.

¶22.    In order to be a holographic will, a writing must "be executed in accordance with the

specific requirements of the statute." *Wilson v. Polite*, 218 So. 2d 843, 850 (Miss. 1969). "A holographic will must be entirely in the handwriting of the testator and subscribed by him." Robert Williford & Samuel Williford, *Mississippi Probate and Estate Administration*, § 2:3 (3d ed. updated Aug. 2024).

¶23.    In *Sullivan v. Jones*, 130 Miss. 101, 93 So. 353, 354 (Miss. 1922), the supreme court stated:

> This court held that this paper was neither in form nor substance a will, and in the absence of any evidence to show that it was intended as a will, it was not one. In the cases of *Buffington v. Thomas*, 84 Miss. 157, 36 So. 1039 [(1904)], and *Prather v. Prather*, 97 Miss. 311, 52 So. 449 [(1910)], this court held that letters testamentary in character, and wholly written and signed by the testator, constituted valid holographic wills.
>
> Under these decisions it is well settled that a letter, wholly written and signed by a deceased, where it is his intention to do so, and which does dispose of his property, may constitute a valid holographic will, that the intention of the writer to dispose of his property after his death is the determining question, and **that parol testimony is also admissible to show whether or not this letter was intended by him as a will**.

(Emphasis added). The chancellor heard Morton's testimony before the will was admitted to probate. Morton testified that he could identify Elijah's signature on the document. Further, he testified that Elijah showed him the document, allowed him to make a copy, and twice identified the document as his will.

¶24.    The chancellor found that Elijah's handwritten note met the requirements of section 91-5-1 and admitted the holographic will to probate. The handwritten document was wholly in Elijah's handwriting, and it was subscribed by him on the same day that Elijah met with Morton. We find that the chancellor did not err by admitting the holographic will to probate.

**II.    Whether the trial court erred in its finding that Elijah's home and thirty-five acres should pass to his seven adult children, equally, pursuant to the laws of intestate succession.**

¶25.    After admitting the will to probate, the chancellor found that two provisions of Elijah's will were in hopeless conflict. The second and third clauses of the will read as follows:

> I want my 35 acres to stay as is, not to be divided. (no selling) When the trees are solded, each one of three (Mimi, Betsy & Tamika) to get equal parts I am leaving my house and its contents to Mimi.

In considering these provisions, the chancellor found, as to the second clause:

> This clause is ambiguous because it fails to indicate to whom the subject land is bequeathed; the land cannot simply stay "as is."

As for the third clause, the chancellor found:

> The home Mr. Forkner lived in is located on Parks Road and is situated on 35 acres of land. There is no way to bequeath the Parks Road house to Mimi but leave the land upon which it sits "as is, not to be divided." Leaving Mimi the house on Parks Road would require division of the land.

Having found the will to be ambiguous in this regard, the chancellor conducted a full evidentiary hearing on the issue of the construction of these provisions. Ultimately, the chancellor determined that extrinsic evidence failed to provide an answer for the ambiguity. As set forth above, there were certain provisions of the will that the chancellor found were not ambiguous and therefore found that distribution should be made in accordance with the will. All remaining property not specifically set forth in the chancellor's order was to be distributed pursuant to the laws of intestate succession.

¶26.    Mimi argues on appeal that the "extrinsic evidence, i.e. the Trust written by Morton

designed to effectuate [Elijah's] intentions, demonstrates that [Elijah] intended Mimi to take a life estate in the house together with one acre surrounding the property." Mimi does not argue that the provisions cited by the chancellor were not ambiguous but, rather, argues that the "Forkner Family Trust clears up any ambiguity with regard to the specific property meant for Mimi Forkner Berry as well as [Elijah's] intention that she hold a life estate in the property."

¶27.   The chancellor considered the pleadings, heard testimony, and came to the conclusion that the extrinsic evidence did not resolve the ambiguities in the holographic will.  As such, she found that the provisions of the will that were ambiguous could not be accomplished, so the property would be distributed according to the laws of intestate succession. The chancellor held:

> Our public law provides for the descent and distribution of property not effectively devised by will. *See* Miss. Code Ann. §§ 91-1-1, et seq., (1972). "At death one's property passes according to one's valid will, subject to the carefully limited judicial authority to supplement, reform and otherwise construe that will, then only to the extent that the will so construed fails according to the statute of descent and distribution." *Tinnin v. First United Bank of Mississippi*, 502 So. 2d 659, 665 (Miss. 1987). When a particular devise lapses, the same then passes to the testator's heirs at law as though he had died intestate. *Moffett v. Howard*, 392 So. 2d 509, 512 (Miss. 1981); *Hays v. Cole*, 221 Miss. 459, 466, 73 So. 2d 258, 260 (1954); *National Bank of Greece v. Savarika*, 167 Miss. 571, 597, 148 So. 649, 656 (1933); *Lewis v. Lusk*, 35 Miss. 401, 423 (1858); *cf. Bond v. Dukate*, 118 Miss. 516, 519-20, 79 So. 86, 87 (1918).

¶28.   We find that the provisions of the holographic will relating to the disposition of the thirty-five acres and the house are in conflict and create an ambiguity. The extrinsic proof does not resolve the problem. Elijah never used the phrase "life estate" or the word "trust"

when speaking with Morton and had previously refused to execute trust documents Morton prepared before the death of his wife. Further, Elijah never saw the documents prepared by Morton after their May 19, 2020 meeting. The chancellor did not err by finding that the thirty-five acres and the house should pass by intestate succession.[7]

### III. Whether the trial court abused its discretion when it awarded Mimi all the contents of Elijah's personal residence.

¶29. On May 16, 2023, Mimi filed a motion for reconsideration of the chancellor's May 9, 2023 judgment, asking that it be amended to find that the will bequeaths Mimi a life estate in the 223 Parks Road residence with one acre of real property surrounding the residence, with ownership of the remaining land to Mimi, Betsy, and Tamika. Betsy and Tamika responded on May 17, 2023, asking the chancellor to deny Mimi's motion. On May 25, 2023, the chancellor entered an order denying Mimi's motion for reconsideration. However, in that order the chancellor clarified the May 9, 2023 judgment to provide that Mimi was entitled to the contents of Elijah's personal home at 223 Parks Road.

¶30. Tamika and Betsy contend on cross-appeal that the trial court found the third clause of the handwritten document, "I am leaving my house and its contents to Mimi," was ambiguous because Elijah also owned rental property aside from his primary residence. The court also found that the clause did not specifically identify which house he was referencing. However, Mimi was questioned at the August 24, 2022 hearing regarding Elijah's properties

---

[7] The provision of the will that the thirty-five acres should stay "as is" and not be divided or sold would likely have been an "unreasonable restraint on alienation of land." *See Hemeter Props. LLC v. Clark*, 178 So. 3d 730, 734 (¶15) (Miss. Ct. App. 2012). Since we find that the land passes by intestate succession, there is no need to address that issue further.

and their contents:

Q. What properties did your father own, real properties did your father own at his death?

A. You mean addresses?

Q. Addresses would be great if you know them.

A. I don't know the exact numbers but a rental property on Cox, Barrett, Melba Street, 223 Parks Road.

THE COURT: How many rental properties are you referring to? Was that three separate rental properties?

A. Yes, ma'am.

Q. I'm going to ask you about them individually now.

A. Okay.

Q. The Cox Street property.

A. Yes, ma'am.

Q. That was a rental property?

A. Yes, ma'am.

Q. Was it being occupied at the time of your father's death?

A. No, ma'am.

Q. Did your father have any contents in that property on Cox Street?

A. No, ma'am.

Q. The property that's on Barrett Street, that was a rental property?

A. Yes, ma'am.

Q. Was it being occupied at the time of your father's death?

14

A. No, ma'am.

Q. Did your father have any contents in that property on Barrett Street?

A. No, ma'am.

Q. The property that's on Melba Street, that was a rental property?

A. Yes, ma'am.

Q. Was that property being rented at your father's death?

A. No, ma'am.

Q. Did your father have any contents in that property on Melba Street?

A. No, ma'am.

Q. And those are the only three properties that you identified at your father's death as rental properties?

A. Yes, ma'am.

Mimi further testified that she had lived with her father at 223 Parks Road since September 28, 2019, after her mother died.

¶31. Considering the testimony that the Parks Road property was the only location that actually contained any of Elijah's personal property and that Mimi had lived in that house with her father after her mother's death, we find the chancellor did not err by clarifying the original judgment to award Mimi the personal property in the residence at 223 Parks Road.

**IV.     Whether the trial court abused its discretion by allowing Mimi to be reimbursed from estate funds for expenses and attorney's fees incurred by Mimi for her own personal benefit, including payment of the claim filed by Ronald Morton.**

¶32. On May 11, 2023, Mimi filed her petition to pay property taxes owed by the estate for

15

reimbursement to herself as the executrix for costs incurred to date, payment of probated claims, and payment of interim attorney fees. After a hearing on May 24, 2023, the chancellor entered an order dated May 25, 2023, authorizing Mimi to pay the 2021 and 2022 property taxes on Elijah's real property, consisting of the house on Parks Road (situated on thirty-five acres) which was Elijah's personal residence, and on his three rental properties. The order also allowed Mimi to reimburse herself as executrix $16,714.36 from estate funds for "legal fees, property taxes, insurance, repairs, bush hogging, car tags, and general maintenance of the properties to preserve the estate" and certain probated claims in the amounts set forth in the order.[8] Finally, the order authorized Mimi to pay attorney's fees and expenses "accumulated to the date of the itemization, the sum of $22,891.11 to Blackmon and Blackmon, PLLC."

¶33. On cross-appeal, Tamika and Betsy allege that the chancellor was manifestly wrong in authorizing Mimi to reimburse herself from the estate for costs related to the Parks Road home because of her unauthorized use of the home and her refusal to allow the other heirs access to the home. Tamika and Betsy argue that Mimi's expenses were incurred as a result of her "improper and exclusive use of estate property by Mimi and her family without any monetary payment to the estate." In their brief, they specifically take issue with the reimbursement to Mimi for funds she paid to her husband for yard work he provided on the Parks Road house and other properties owned by Elijah at his death and for utility costs in

_____

[8] Tamika and Betsy did not object to the payment of the real property taxes or probated claims. Although Tamika and Betsy had filed a motion to disallow Morton's claim for attorney's fees, the parties later agreed to pay Morton's attorney's fees in the reduced amount of $2,760.00. Morton's fees are not an issue on appeal.

the amount of $9,582.58. This argument has no merit because the chancellor denied these costs.

¶34.    Tamika and Betsy also argue on appeal that the chancellor erred by awarding Mimi attorney's fees, contending that those fees included not only fees relating to the actual probate of the estate, but also fees she incurred relating to the will contest. Tamika and Betsy also took issue with the chancellor's authorization for an additional $22,891.11 to be paid to Mimi's attorneys Blackmon & Blackmon PLLC.

¶35.    *Obert Law Group P.A. v. Holt*, 328 So. 3d 622, 624 (¶2) (Miss. 2021), sets forth our standard of review regarding attorney's fees provided during the administration of an estate:

> It is well-settled that the amount allowable as attorney's fees for services rendered in the administration of an estate rests within the sound discretion of the chancery court. The chancellor's decisions in these cases are reviewed for abuse of discretion, and it is improper under our law to conduct a de novo review.

(Footnote and internal quotation mark omitted). Further, "[t]o collect attorney's fees from an estate, court approval is required. So if an attorney is paid from an estate without court approval, he 'takes the fee subject to the peril of having it disapproved later by the chancellor.'" *Id*. at (¶1).

¶36.    Mississippi Code Annotated section 91-7-281 (Rev. 2021) governs awards of attorney's fees:

> In annual and final settlements, the executor, administrator, or guardian shall be entitled to credit for such reasonable sums as he may have paid for the services of an attorney in the management or in behalf of the estate, if the court be of the opinion that the services were proper and rendered in good faith.

¶37.    In determining what is reasonable, Mississippi Rule of Professional Conduct 1.5 lists

17

the factors to be considered by the trial court:

> (a) A lawyer's fee shall be reasonable. The factors to be considered in determining the reasonableness of a fee include the following:
>
>> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
>>
>> (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
>>
>> (3) the fee customarily charged in the locality for similar legal services;
>>
>> (4) the amount involved and the results obtained;
>>
>> (5) the time limitations imposed by the client or by the circumstances;
>>
>> (6) the nature and length of the professional relationship with the client;
>>
>> (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and
>>
>> (8) whether the fee is fixed or contingent.

Those factors were identified by our supreme court in *McKee v. McKee*, 418 So. 2d 764, 767 (Miss. 1982).

¶38.   In *Gussio v. Gussio*, 371 So. 3d 734, 753 (¶53) (Miss. Ct. App. 2023), we explained:

> "Before granting or denying attorney's fees, a chancellor must apply the *McKee* factors." [*Gilmer v. Gilmer*,] [297 So. 3d 324,] 339 (¶53) [(Miss. Ct. App. 2020)]. The *McKee* factors include:
>
>> (1) relative financial ability of the parties; (2) the skill and standing of the attorney employed, (3) novelty and difficulty of issues in the case, (4) the responsibility required in managing the

18

case, (5) time and labor required, (6) the usual and customary charge in the community, and (7) whether the attorney was precluded from undertaking other employment by accepting the case.

*Id*. These factors are "strikingly similar to the factors set out in Miss. R. Prof. Conduct 1.5(a)." *Tupelo Redev. Agency v. Gray Corp.*, 972 So. 2d 495, 521 (¶80) (Miss. 2007).

(Footnote omitted).

¶39.    In *Vandenbrook v. Vandenbrook*, 292 So. 3d 991, 1004 (¶46) (Miss. Ct. App. 2019), while recognizing the broad discretion given the chancellor regarding the award of attorney fees, we held:

> "The award of attorney's fees . . . is left to the discretion of the chancellor, assuming [s]he follows the appropriate standards." *Speights v. Speights*, 126 So. 3d 76, 81 (¶15) (Miss. Ct. App. 2013) (quoting *Creekmore v. Creekmore*, 651 So. 2d 513, 520 (Miss. 1995)). A chancellor's award or denial of fees should be supported by findings of fact regarding the *McKee* factors. *Grice v. Grice*, 726 So. 2d 1242, 1255 (¶51) (Miss. Ct. App. 1998); *Weeks v. Weeks*, 29 So. 3d 80, 92-93 (¶¶57-59) (Miss. Ct. App. 2009) (denial of fees remanded for failure to consider the *McKee* factors).

¶40.    In *Morton Law Firm PLLC v. Merchant* (*In re Est. of Stimley*), No. 2023-CA-00940-COA, 2024 WL 4439985, at *3 (¶10) (Miss. Ct. App. Oct. 8, 2024), we reversed and remanded on the issue of attorney's fees based upon a lack of consideration of the *McKee* factors:

> This Court noted that while it was true "that the lack of a factor-by-factor analysis does not immediately warrant a reversal," there must be proof "support[ing] an accurate assessment of fees under the *McKee* criteria." [*Gilmer*, 297 So. 3d at] 339 (¶55). Accordingly, the chancellor's order containing no discussion or analysis of the factors was not sufficient and, thus, reversed and remanded. *Id*. at (¶¶55-56). *Gilmer*'s holding is clear: the mere mention of the *McKee* analysis is not enough to support a chancellor's award

19

of attorney's fees. Here, the chancellor did not include any mention or discussion of the *McKee* factors in the order awarding attorney's fees.

In *Stimley*, 2024 WL 4439985, at \*4 (¶13), this Court further explained that a judge's discretion is not without restraint, "and a consideration of the Rule 1.5/*McKee* factors is **mandatory**." (Emphasis added) (citing *BellSouth Pers. Commc'ns LLC v. Bd of Sup'rs of Hinds Cnty.*, 912 So. 2d 436, 448 (¶39) (Miss. 2005)); *see also McLemore v. McLemore*, 63 So. 3d 468, 485 (¶46) (Miss. 2011) ("[A] chancellor is **required** to review the reasonableness of requests to charge fees to an estate, considering the *McKee* factors." (emphasis added)).

¶41. Like in *Stimley*, the chancellor here failed to address the *McKee* factors in either her order or on the record, and as a result, we must reverse this part of the judgment and remand for the chancellor to consider the *McKee* factors before making her ruling on the payment of the attorney's fees to Blackmon & Blackmon PLLC.

## CONCLUSION

¶42. We reverse and remand the chancellor's award of Blackmon & Blackmon PLLC's attorney's fees for the chancellor to apply the *McKee* factors with supporting findings. We affirm the remaining issues as discussed above.

¶43. **ON DIRECT APPEAL: AFFIRMED. ON CROSS-APPEAL: AFFIRMED IN PART; REVERSED AND REMANDED IN PART.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., LAWRENCE, McCARTY, SMITH AND WEDDLE, JJ., CONCUR. WESTBROOKS, J., CONCURS IN RESULT ONLY WITHOUT SEPARATE WRITTEN OPINION. McDONALD, J., CONCURS IN PART AND DISSENTS IN PART WITHOUT SEPARATE WRITTEN OPINION.**

20